274 F.2d 132
 WOODMONT, INC., a corporation, Continental Materials
Corporation, formerly Continental Uranium, Inc., a
corporation, Appellants,
v.
S. DANIELS, L. R. Allison and A. J. Haney, co-partners doing
business as Daniels Construction Company, Appellees.
S. DANIELS, L. R. Allison and A. J. Haney, co-partners doing
business as Daniels Construction Company, Cross-Appellants,
v.
WOODMONT, INC., a corporation, Continental Materials
Corporation, formerly Continental Uranium, Inc., a
corporation, Cross-Appellees.
 Nos. 6041, 6042.
 United States Court of Appeals Tenth Circuit.
 Dec. 23, 1959, Rehearing Denied Feb. 11, 1960.
 
 Calvin A. Behle and Keith E. Taylor, Salt Lake City, Utah (C. C. Parsons, Elliott W. Evans and A. D. Moffat, Salt Lake City, Utah, were with them on brief), for appellant and cross-appellees.
 Edward W. Clyde, Salt Lake City, Utah (J. R. Modrall, Albuquerque, N.M., and Allan E. Mecham, Salt Lake City, Utah, were with him on brief), for appellees and cross-appellants.
 Before MURRAH, Chief Judge, and PHILLIPS and PICKETT, Circuit Judges.
 MURRAH, Chief Judge.
 
 
 1
 This is an appeal and cross appeal from a judgment in a diversity action for damages based upon actionable misrepresentations in the execution of a contract. Federal jurisdiction is concededly present. By the terms of the contract of June 20, 1955, as amended, the plaintiff-appellee, Daniels Construction Company, agreed with appellant, Woodmont, Inc., to excavate approximately 2,500,000 cubic yards of overburden for the strip mining of a uranium ore mine in Utah for 29cents per cubic yard. Appellant, Continental Materials Corporation, the parent company of Woodmont, guaranteed Woodmont's performance of the contract. The contract pertinently provided that the contractor 'is not relying upon any representations or promises of the Company except those contained in this agreement'; and that 'There are no previous or contemporary representations or warranties of the Company or the contractor not set forth herein.' The contract also pertinently provided for heavy penalties for failure to complete the contract on the specified date.
 
 
 2
 The first part of the work progressed as expected, but about the first of December, the contractor encountered unanticipated rock or sandstone, and thereupon indicated that it would expect additional compensation, but made no formal demands in that respect. About the middle of February, it was definitely determined that the last sixty to ninety feet of material was hard sandstone rock which could be removed only by systematic drilling and blasting. About this time, apparently both parties became concerned with the possibility that the contractor would not be able to complete the contract on time. The contractor was concerned with the heavy penalties involved, and the Company was apparently concerned lost ore would not be available for its projected mill.
 
 
 3
 In any event, after negotiations, the parties amended their original contract to provide that the contractor would concentrate on the excavation of one-half of the pit area to insure the availability of ore on the completion date; and that the contractor would be allowed one day additional time for each day he completed that part of the pit area ahead of the date fixed for the completion of the contract. The contractor also agreed to drill, blast and remove additional sandstone adjacent to but outside the original pit area not contemplated by the original contract; and the Company agreed that in addition to the 29cents provided for in the contract, it would pay $1.03 per foot of hole drilled; and it was further agreed that 'no additional amount shall be payable for any blasting other than that provided for in this paragraph.'
 
 
 4
 The amendment, drafted by the Company's legal department, was signed by its field manager Pruess on March 17, 1956, and was signed by partner Daniels for the appellees on March 20. On that date, Daniels mailed to the Company a letter previously prepared by his legal counsel in which it was stated that 'our contract price was of course fixed upon the assumption that the data which you furnished us regarding the formation here was correct. We of course realize that you were under the impression that your data was also correct and we do not mean to intimate any question of bad faith on your part.' And, further, that 'The presence of this bedrock has, as you know, materially increased the cost of our operation, and although we are going ahead with the removal of the overburden pursuant to your orders, we wish it clearly understood that we are doing this with the reservation of our rights to call on you for additional compensation in a reasonable amount to compensate us for this increased cost.' The letter went on to state that appellees had been advised that in cases of this kind where it had been a 'mutual mistake of fact,' they were within their legal rights in insisting upon additional compensation 'in excess of the unit price specified in our contract.'
 
 
 5
 On the following April 11, the legal department for Continental replied, expressing surprise at the letter in view of the provisions of the March 17 amendment, to which they consented 'in order to settle the very claims which you are now reopening in your letter of March 20, 1956;' that 'we find ourselves in the position of having once settled what we considered a groundless claim and now having the claim asserted once again * * *.'
 
 
 6
 The claims with respect to additional compensation for excavation were not pressed further and the contractor continued to remove the overburden in accordance with the amendment and to accept payment by monthly check with an attached voucher reciting that it was 'in full settlement of accounts below. If not correct return without alterations and state differences.'
 
 
 7
 In October 1956, the original contract was again amended to provide for additional stripping caused by a landslide, at 50cents per cubic yard instead of 29cents. When the contract was completed, the final check in payment of the contract price was accompanied by a letter, calling attention to a paragraph in the contract providing that acceptance of the final payment by the contractor would constitute a release and waiver of all claims by the contractor against the Company. The contractor returned the check and later accepted it only when the Company had agreed that the acceptance would not effect a release or waiver. This suit was brought to recover the loss of bargain caused by the additional cost of excavating the hard rock which the contractor did not anticipate when the contract was executed.
 
 
 8
 The claim was stated on several different theories, but the trial court's judgment is based upon actionable misrepresentations of responsible agents of the appellant companies to the contractor to the effect that with the exception of the designated boulder area, the overburden to be excavated was capable of being moved by the use of heavy dirtmoving equipment without drilling or blasting. The claim stated, and the trial court found, that in reliance upon these representations, the contractor bid 29cents per cubic yard for the excavation work, that after removing approximately two-thirds of the material, and in the early part of 1956, it encountered sandstone or hard rock necessitating drilling and blasting; that at that time it became aware of the inaccuracy of the misrepresentations, but did not know that they had been deceitfully made; that proceeding on the theory of mutual mistake, it pursued their contract at great cost after having asserted its intention to claim extra compensation for the removal of the hard rock; and that it did not know the representations were knowingly false until revealed by discovery proceedings after the institution of this suit.
 
 
 9
 More specifically, the court found from credible testimony that when the contractor-partners visited the mine site preparatory to bidding, they were shown about the vicinity by Latham and Bailey, responsible field representatives of the companies; that they inspected the surface of the area to be excavated, examined exploratory plug drilling reports; talked to the drillers, and were told by Latham and Bailey that, '(a) except for the said area of boulders which could be seen upon the surface of the area to be stripped, the material to be excavated could be removed with earth-moving equipment without the necessity of drilling and blasting; (b) that the material to be stripped from the large north pit upon which the plaintiffs proposed to bid would be substantially the same kind of material insofar as required method of stripping was concerned as that which had been removed from the small south pit and that this latter material had been removed by using earth-moving equipment and without drilling and blasting, except for the boulder area.'
 
 
 10
 The court found that Latham and Bailey made these representations in the honest belief that they were true, but that the companies' boards of directors knew or had good reason to know that they were untrue and that the contractor relied upon them when it submitted its bid and entered into the basic contract. The specific finding in that regard is to the effect that while the directors had no 'positive knowledge' of the extent of the hard rock formation, they were convinced from reports of Vice-President Sullivan, in charge of exploratory operations, and general manager Pruess, that large quantities of hard rock would be encountered; that from the lowness of the contractor's bid and other circumstances, they knew or had reason to know that the contractor was unaware of the hard rock and could not reasonably be expected to know of it. From this the trial court concluded that the companies fraudulently induced the execution of the contract by actively encouraging the contractors to erroneously assume that the material to be excavated could be removed by their heavy earth-moving equipment.
 
 
 11
 The companies seem to acknowledge a duty to disclose any pertinent information which was available to them and unavailable to the contractor in the exercise of reasonable care at the risk of being actionably deceptive. Indeed, this seems to be the modern concept of tort liability in cases of this kind. See Prosser, Torts, 87, p. 532 (2d Ed.); Keeton, Actionable Misrepresentations, 1 Okla.L.Rev. 21. The companies emphatically deny, however, that they knew of the existence of hard rock. They say with emphasis that they had no more than an opinion, gathered from data which was equally available to all parties; that they were under no duty to point out or call attention to obvious business risks to these experienced earth-moving contractors. Particularly, they say the representations of Latham and Bailey were statements of opinion and so understood and acted upon; that in any event, they were admittedly made in good faith, hence nonactionable; and moreover, the companies' boards of directors had no actual knowledge of such representations and could not be constructively charged with such knowledge so as to constitute scienter.
 
 
 12
 We agree with the trial court that the representations of Latham and Bailey were more than mere expressions of opinion. They were intended to give assurance to the contractor. But they were made in good faith, and to be sure were in themselves nonactionable although the contractor relied upon them to its detriment. As for the directors, there is nothing in the record to indicate that they actually knew that contractors were relying upon Latham's and Bailey's representations as a basis for their misapprehension. And while in some cases, a corporation may be held constructively responsible for the composite knowledge of all of its agents, whether acting in unison or not, see Sawyer v. Mid-Continent Petroleum Corp., 10 Cir., 236 F.2d 518; Inland Freight Lines v. United States, 10 Cir., 191 F.2d 313, we are unwilling to apply the rule to fix liability where, as here, intent is an essential ingredient of tort liability as for deceit. See Restatement, Agency 2d, 275, Comment b.
 
 
 13
 The drilling reports upon which both the contractor and Latham and Bailey relied as indicating the nature of the overburden, in part at least, were taken from 140 to 150 exploratory plug drilled holes, about 53 of which were within the pit area. These reports were made by drillers from cuttings and returns from the drilling operations. They purported only to report the driller's rough estimate of the nature and thickness of penetrated formations. And, they were admittedly consistent with the idea that the penetrated overburden could be removed with heavy dirt-moving equipment.
 
 
 14
 Geological logs were also made from cores taken from these and other borings in the vicinity. These logs were made by the companies' geologists to define the top and extent of the ore body for the purpose of determining whether the ore could be most economically mined by underground tunneling or by the surface stripping method. These core logs were not shown to the contractor when it was considering its bid and contract. Both parties emphasize the importance of the information disclosed by these logs, and take widely different views concerning the interpretation to be placed upon them. Specifically, the contractor makes reference to thirteen of the logs taken from drill holes within the pit area. They interpret them to show 18 to 30 feet of hard rock above the stripping line or top of the ore body.[1] At the same time, the companies interpret the same core logs to show not more than a depth of 10 feet of hard rock to be excavated, and demonstrate their interpretations by the use of charts and profiles. They say the core logs were, in any event, made and compiled to show the depth of the ore and not to reflect the hard rock above, and were therefore of no importance in determining the nature of the material to be excavated.
 
 
 15
 Careful examination of these logs and all accompanying data leaves us with the impression that they are susceptible to either interpretation, depending upon the approach and methods of computation. In any event, it is clear that both the drilling reports and geological logs were inconclusive as to the extent of hard rock to be excavated. Indeed, there is nothing in the record from which it may be said that the companies withheld pertinent knowledge peculiarly available to them.
 
 
 16
 To be sure, actionable fraud cannot be predicated upon unforeseen difficulties arising from misjudgment of facts equally available to parties to the contract. Nor can it arise out of mere differences of opinion concerning the facts upon which the parties contract. In an arms-length transaction like ours, neither party owes a duty to advise the other in the consummation of a contract. They are free to drive a hard albeit honest bargain. Thus, the company owed no duty to speak simply because it entertained an opinion or even a conviction concerning the nature of the material to be excavated while knowing that the contractor entertained another view and was acting upon it. The company could remain silent while the contractor labored under its misapprehension of material facts. See 3 Restatement, Torts, 551; Cole v. Parker, 5 Utah 2d 263, 300 P.2d 623.
 
 
 17
 But even so, the trial court's judgment does not rest upon the failure to disclose peculiar knowledge, nor does it turn upon the failure to speak when the Company was at liberty to sit silently by. Rather, the trial court's judgment is based primarily upon positive representations of material facts which the companies actually believed to be untrue. The mischief lies not in the failure to disclose peculiar knowledge, but in actively inducing the contractor to contract with the knowledge or belief that it was laboring under a misapprehension of the material facts. It is indeed the law in Utah as elsewhere that positive assertions to induce a contract which the maker reasonably believes to be untrue constitutes fraud and deceit. See Pace v. Parrish, 122 Utah 141, 247 P.2d 273; Leasure v. Hughes, 72 Okl. 75, 178 P. 696; First National Bank of Coyle v. Horsley, 174 Okl. 83, 49 P.2d 495.
 
 
 18
 It is fairly plain from the record that Vice-President Sullivan was convinced that large quantities of hard rock would be encountered in the stripping operation. For, indeed, in his report to the Company on April 7, before the contractors visited the mine site, Sullivan had stated that the 'bottom 30 to 40 percent (of the proposed pit) will probably require blasting, which is estimated to cost approximately 60cents per yard.' Pruess' report to the Board on the economics of strip mining in May 1955, after the contractor's 29cents bid had been submitted, also indicated his belief that the cost of removing the 'bottom two-thirds or one-half of the cubic yardage * * * could well rise over 50cents.' It is thus fairly inferable from the whole record that in considering the economics of strip mining over the underground method, the companies assumed that the bottom 30 to 40 percent of the pit area would be hard rock. And there was evidence to the effect that when on May 17, 1955, the contractors met with Sullivan and Pruess to negotiate for the contract, both Sullivan and Pruess indicated that the contractor's earth-moving equipment was sufficient, and that they wouldn't even need to use their shovels. There was testimony to the effect that Sullivan and Pruess did say that there was 'some sandstone overlaying the ore that in all probability they would want us to move while we were there, but they would negotiate another price for that if they wanted us to remove it.' A cross section or specification exhibit was used at the conference to demonstrate the top of the sandstone, and the contractors were told that they were to strip down to the top of the sandstone, and that the interval between the top of the sandstone and the top of the ore was the material that 'in all probability they would negotiate a price for us to move.'
 
 
 19
 From all of this, the trial court concluded that at the time of the May 17 meeting, Sullivan and Pruess reasonably knew that the contractors were assuming that the material to be excavated could be moved by earth-moving machinery, and believing such assumption to be untrue, actively induced the contractors to contract on that basis. These purposeful misrepresentations and inducements to contract under a misapprehension of the material facts constituted actionable deceit, and since in these circumstances, the information and acts of Sullivan and Pruess were the information and acts of the companies whom they represented, the findings and conclusions of the trial court in this respect are clearly correct.
 
 
 20
 And these findings are not affected by the contract provisions which purport to confine the representations to those in the written contract. Such prophylactic provisions, being against the public interest, are unenforceable. See Roy Klossner Co. v. McIntire, Tex. Civ.App.,301 S.W.2d 197; Miller v. Troy Laundry Machinery Co., 178 Okl. 313, 62 P.2d 975; Restatement, Contracts, 573. And for the same reason, the acceptance of the monthly checks on condition that they are in full settlement of the accounts would not operate to exculpate the companies.
 
 
 21
 This court awarded damages to the appellee on the basis of 'loss of bargain,' or the ascertained reasonable value of the excavated hard rock rather than 'out-of-pocket loss.' And, this seems to be a permissible measure of damages for deceit in Utah and elsewhere. Alder v. Crosier, 50 Utah 437, 168 P. 83; Hecht v. Matzler, 14 Utah 408, 48 P. 37; Kinnear v. Prows, 81 Utah 135, 16 P.2d 1094. See also Annotation 124 A.L.R. 37; Restatement, Torts, 549; McCormick on Damages, 121. From competent evidence, the court ascertained that the reasonable value of excavating the disputed 705,622 cubic yards of hard rock was 91cents per cubic yard. The appellants do not challenge the formula used. They do say, however, that the best evidence of the reasonable value of the work performed is the appellees' own cost, and there was no evidence of it. They further say with emphasis that the loss of bargain or reasonable value is determinable by ascertaining the extra cost by which appellees' profits were diminished, and that the trial court's determination allowed the plaintiffs to recover the profit on the extra work, and such is not a proper element of the loss of bargain.
 
 
 22
 It is of course true that costs have a direct bearing upon the reasonable value of the work, and there was no direct evidence of the appellees' costs of removing the unanticipated hard rock. But there was credible evidence that the reasonable value of moving the material was from 90cents to $1.25 per cubic yard, and that these computations included costs plus a reasonable profit. While the appellees' actual cost may well have been a more accurate method of determining reasonable value, no objections were made to this testimony-- indeed, no contravailing evidence was offered until after the court had announced its decision. We think the court's determination of the reasonable value of the removal of the hard rock is supported by competent evidence and it will not be disturbed.
 
 
 23
 The court restricted recovery to the reasonable value of excavations prior to the amendment of March 17, 1956, after hard rock had been actually encountered and the appellees knew that the representations with respect thereto were inaccurate or untrue. The court accordingly awarded damages for the reasonable value of 68,000 cubic yards of hard rock excavated prior to March 17, on the basis of an adjusted unit price, or a total of $49,810, less $16,994 heretofore paid, at the rate of 29cents per cubic yard.
 
 
 24
 The appellees have appealed from that part of the judgment which denies recovery for the reasonable value of the entire 705,622 cubic yards of hard rock. The contention is to the effect that they could not have waived or contracted away the fraud until it was discovered after the contract was fully performed. They say that after discovery of the true facts, but not the fraud, they proceeded to perform the contract under an assumed mutual mistake of fact and at the risk of heavy penalties for failure to complete on time; that had it known of the deceit, it would not have acted as it did in making the amendment; and that the amendment is thus infected by the original deceit and cannot operate to preclude full recovery for fraud and deceit in the inducement of the contract, citing United States v. Atlantic Dredging Company, 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735.
 
 
 25
 It is of course true that one does not waive fraud until he discovers it, or should have in the exercise of due care. And, it is also a rule of salutary application in cases of this kind that a defrauded party to a partially executed contract does not waive his right to claim the benefits of his bargain by continuing to perform the contract after discovering the fraud, unless he affirmatively indicates his intention to do so. See cases collected13 A.L.R.2d 807, 846, 6. The trial court recognized what is equally true, that an amendment to a contract which is tainted with the fraud of the original contract is also a nullity. The court reasoned, however, that the contractor's ignorance of the Company's deception was immaterial after the March amendment; for inasmuch as the contractor knew the exact nature of the material to be encountered, and received additional consideration by way of an extension of time, it could under no 'stretch of the imagination' be said to be relying upon the original misrepresentations in agreeing to the amendment. In the words of the trial court, the contractor could not recover damages for the period following the March 17 amendment, 'not because there had been a full discovery of the fraud on that date, but because there had been a new contract with additional considerations prospectively operating which the plaintiffs cannot question because they then had no right to rely on the original misrepresentations. * * * it didn't matter whether plaintiffs knew that the original misrepresentation was intentionally deceitful or not.' Thus, the trial court's judgment with respect to prospective damages was made to rest squarely upon the absence of the essential element of reliance, Pace v. Parrish, 122 Utah 141, 247 P.2d 273; Restatement, Torts, 537, not upon a waiver of the fraud. The March amendment did not constitute a waiver but positive evidence of nonreliance.
 
 
 26
 This reasoning of the trial court is said to be directly contra to the reasoning and conclusions in the Atlantic Dredging Company case on indistinguishable facts. The facts in that case are strikingly similar to our own, but that suit in the Court of Claims was essentially on contract for the difference between the cost of excavating done and the amount received under the contract, not in tort for loss of bargain, as here. The court held that the continued performance of the contract after knowledge of the true facts and until the deception was discovered, did not bar recovery. But, while the contractor relied upon the government's misrepresentations, there was no charge or finding of fraud, and reliance thereon could not have been an essential element of the right of recovery, as here. The basic difference in the two cases lies in the nature of the claims and the relief sought, and the essential ingredients of the right of recovery in the two cases.
 
 
 27
 On the whole, the trial court in our case was avowedly influenced by the obvious maneuvering of the parties after discovery of the true facts culminating in the amendatory agreement. Significance was attached to the fact that the contractors entered into the amendatory contract without asserting or even reserving the right to claim additional compensation for hard rock excavated while their counsel at the same time was preparing a formal demand for extra compensation to be submitted immediately after securing additional consideration by way of extension of time and extra compensation for additional excavation. And while this does not indicate a disposition not to waive a right to extra compensation, it does without doubt indicate that the contractor was proceeding with full knowledge of the true facts-- that it was making the most of a hard bargain.
 
 
 28
 Significance was also given to the fact that the contractor continued to submit invoices for excavations, based on the contract price of 29cents per cubic yard, and to accept payment therefor on the expressed condition that it was in full settlement for the excavation covered by the submitted invoices. We agree with the trial court that the contractor cannot recover the benefit of his bargain after he learned of the true facts and contracted prospectively in the face of such knowledge.
 
 
 29
 The court was concerned lest the March amendment operate as a waiver to bar the damages accrued before discovery of the true facts and the execution of the amendment. As 'unthinkable' as it seemed to the trial court that the contractor should receive extra compensation for excavation of hard rock after discovery of the true facts, and was no longer relying upon the Company's representation, it seemed 'almost equally far fetched' to bar the contractor for full compensation for work done prior to the March amendment, unless the clear terms of the amendment itself or some rigid rule precludes a court of equity from drawing a distinction between the two periods. In that respect, it is sufficient to say that the contractor could not have waived the fraud until it was discovered, and it could not be precluded from recovering upon it until it ceased to rely upon it. Since admittedly the contractor did not discover the fraud until after the performance of the contract and did not rely upon it after the March amendment, the trial court's judgment is clearly right.
 
 
 30
 Finally, the appellant companies complain of the allowance of interest on the sum of $44,912.12, tendered by check on January 8, 1957, on condition that it should 'constitute a release and waiver of all claims by the contractor against the Company, its officers, agents and employees.' The contractor retained the check until March 28, when it returned it, stating that it would not accept it in full payment of its claim for two reasons: (1) it was based on an erroneous computation of the amount due; and (2) the companies had no 'legal right to withhold payment of an amount admittedly due, to try to obtain release of any and all further claims.' After the check was again tendered upon the same conditions, the contractor replied, acknowledging that it was based upon the correct computations, but still refusing to accept it in final payment of all claims against the companies. The trial court held that the companies had no right to withhold the final payment of the amount admittedly due on condition that the contractor waive other claims against the companies, and the contractor was therefore entitled to interest on the amount of the check from the date of the conditional tender on January 8, 1957 to the unconditional tender on February 10, 1958.
 
 
 31
 True, the amount due was not liquidated until April 16, 1957, but in Utah the right to interest is not to be determined by whether the damages are liquidated or unliquidated, but whether the injury and consequent damages are complete. Wunderlich Contracting Co. v. United States ex rel. Reischel & Cottrell, 10 Cir., 240 F.2d 201. The court correctly, we think, awarded interest from the date the amount tendered was due and payable, to wit, January 8, 1957.
 
 
 32
 The judgment is affirmed.
 
 
 
 [1]
 Hole No. 71 shows 30' of sandstone Hole No. 69 shows 30' of sandstone Hole No. 68 shows 28' of sandstone Hole No. 84 shows 23' of sandstone Hole No. 85 shows 18' of sandstone Hole No. 87 shows 26' of sandstone Hole No. 43 shows 21' of sandstone Hole No. 67 shows 20' of sandstone Hole No. 62A shows 18' of sandstone Hole No. 82 shows 21' of sandstone Hole No. 77 shows 20' of sandstone Hole No. 79 shows 18' of sandstone Hole No. 78 shows 18' of sandstone