**William FIEDLER, Plaintiff-Appellee and Cross-Appellant,**

v.

**The McKEA CORPORATION, a corporation, and M. E. Karsten, Defendants-Appellants and Cross-Appellees,**

**and**

**Naturita Supply Company, Inc., a corporation, and Robert O. Wenzel, an Individual, Additional Defendants-Appellants and Cross-Appellees.**

**Nos. 77–1218, 77–1219.**

United States Court of Appeals, Tenth Circuit.

Submitted Jan. 24, 1979.

Decided Sept. 13, 1979.

---

**544**

Max A. Wilson, Sterling, Colo., for defendants-appellants and cross-appellees.

Jim Neil Harkins, of Holcomb, Holcomb & Harkins, Buffalo, Okl., and Michael C. Stewart, of Cooper, Stewart, Elder & Abowitz, Oklahoma City, Okl., for plaintiff-appellee and cross-appellant.

Before McWILLIAMS, DOYLE and McKAY, Circuit Judges.

McKAY, Circuit Judge.

William Fiedler brought this suit for misrepresentation and breach of contract against the McKea Corporation, Naturita Supply Company, Inc., M. E. Karsten, and Robert O. Wenzel. Fiedler was successful in his suit, and the defendants now appeal.

Robert Wenzel was the owner and manager of Naturita Supply Company, a Farmington, New Mexico, concern engaged in the business of supplying pipe. In addition, Wenzel was the president and principal shareholder of the McKea Corporation, which was originally formed to operate a pipeline in Colorado. According to Fiedler, in December 1974 he was told by Wenzel of some potentially profitable work in Oklahoma. At this time Fiedler was the superintendent for J & B Construction Company, and was working on a pipeline owned by Wenzel. Subsequently Wenzel informed Fiedler that he intended to sell a pipeline in Kansas and Oklahoma "with a deal for [Fiedler] to take it up." Record, vol. 6, at 15.

The intended sale did not materialize. Wenzel then asked Fiedler, who was preparing to enter the pipeline construction business, if he knew of potential buyers. Fiedler supplied the name of one company.

During the course of conversations with his friend Lane, who was helping him get his business started, Fiedler referred to the pipeline owned by McKea Corporation, which Wenzel desired to sell. Lane expressed his interest as a potential buyer. Discussions concerning the pipeline took place between Wenzel, Lane, and Fiedler. The three of them conducted inspections of the pipeline in Kansas and Oklahoma.

The pipeline was ultimately sold to M. E. Karsten, one of the defendants. Based on his understanding regarding the nature of the project, Fiedler agreed to remove the pipeline. A contract was executed in which Fiedler promised to remove, straighten, bevel, and stockpile the pipe for twenty-five cents per foot. The contract provided that Karsten and the McKea Corporation were joint venturers, whose responsibilities included paying for all damages sustained by landowners as a result of the project.

Fiedler obtained equipment for the project and began to remove the pipeline in July of 1975. He encountered serious obstacles. Instead of the rather shallow depth he expected, he found that the pipe was much deeper—sometimes between six and nine feet, according to his testimony, and as deep as twelve feet, according to the testimony of his foreman. He also found that the line contained oil and other materials. He had expected to find it clear. In addition, Fiedler experienced delays in pipe removal due to resistance by various landowners. Ultimately, Fiedler abandoned his work in February of 1976, having removed 120,540 feet of pipe.[1]

Fiedler brought suit for fraud and breach of contract. He claimed that misrepresentations had been made regarding the depth of the pipeline and whether it contained oil or other substances. He also contended that the contract was breached by defendants' failure to pay damages to landowners who had permitted Fiedler to operate on their lands. He alleged that this failure induced other landowners to resist entry onto their property and resulted in delays.

1. The broad factual background outlined here is largely undisputed. To the extent factual disagreements persist, we are obliged to view the record in the light most favorable to Fiedler, given the jury verdict in his favor.

Following trial, a general jury verdict was returned in Fiedler's favor for actual damages in the amount of $100,000. Judgment was then entered against the defendants.

The defendants raise several arguments on appeal. The first is that the evidence at trial was insufficient to support a verdict of fraud or misrepresentation. In effect, defendants contend that the court should have directed a verdict in their favor on this issue. Defendants argue that reasonable persons could have reached but one conclusion as to the verdict. *See Taylor v. National Trailer Convoy, Inc.*, 433 F.2d 569, 571–72 (10th Cir. 1970). Our review of the record reveals that a directed verdict would have been improper.

Without attempting an exhaustive discussion of the record, we note that the evidence justified inferences of misrepresentation in several respects. Fiedler testified that Wenzel had told him that the pipeline had been purged of material, that it was less than three feet in depth, and that its removal would be easily accomplished. Fiedler's actual job experience demonstrated otherwise, and there was evidence that Wenzel knew at the time of his representations that it would be so. There was testimony that Wenzel had hired individuals to inspect the pipelines. A witness called by defendants testified that Wenzel had informed him that the pipeline reached a depth of six feet in certain places. There was also evidence from which the jury could have concluded that the pipeline inspection expedition, conducted for the benefit of Lane and Fiedler, was fraudulently conducted. Specifically, there was testimony indicating that a length of pipeline "discovered" on this inspection had been temporarily planted in a shallow position to divert attention from the fact that the actual pipeline was considerably deeper. These evidentiary indications of misrepresentation, although not uncontradicted in the record, were sufficient to justify the jury's verdict of fraud.

Defendants make several additional arguments in connection with their claims of insufficient evidence to support a verdict of misrepresentation. The most plausible contentions are that Fiedler had a duty to determine for himself the nature of the pipeline and that Fiedler waived misrepresentation claims by continuing to work on the project once he had ascertained the actual character of the pipeline.

We do not agree that Fiedler had an independent duty to examine the pipeline. Wenzel represented to Fiedler that the pipeline was of a certain nature; the inspection conducted under Wenzel's supervision confirmed those representations. The fact that Fiedler could have conducted an independent investigation does not mean that the law required it of him. *See Greene v. Humphrey*, 274 P.2d 535, 537–38 (Okl. 1954). We do not think it was unreasonable for Fiedler to have relied on representations concerning the pipeline that were confirmed by a guided inspection.

More troublesome is the contention that Fiedler should have been barred from asserting his claims by his continued work in the face of evidence that conditions were other than as represented. Whatever may be the rule when evidence of fraud is discovered at the executory stage of a contract but the obligor nonetheless opts to perform, a party who discovers fraud only *after* contract performance has begun is entitled to affirm the contract and sue for fraud, absent some expressed intention to waive the fraud. *See Woodmont, Inc. v. Daniels*, 274 F.2d 132, 139 (10th Cir. 1959), *cert. denied*, 362 U.S. 968, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960); *Automobile Ins. Co. v. Barnes-Manley Wet Wash Laundry Co.*, 168 F.2d 381, 384–85 (10th Cir.), *cert. denied*, 335 U.S. 859, 69 S.Ct. 132, 93 L.Ed. 406 (1948); *Holcomb & Hoke Mfg. Co. v. Jones*, 102 Okl. 175, 228 P. 968, 971 (1924); Annot., 13 A.L.R.2d 807, 846–50 (1950). We believe sufficient performance on the contract had been accomplished before fraud was discovered to bring Fiedler within the scope of the latter doctrine. Fiedler aggregated equipment and employees and had begun the work of taking up the pipe before encountering what he clearly would have un-

derstood to be evidence of misrepresentation. Such evidence came in piecemeal fashion. When Fiedler complained about the unexpected difficulties he was encountering, he was informed that he would receive additional compensation. In these circumstances, we are unable to agree that, as a matter of law, Fiedler waived the opportunity to sue for fraud.

Defendants next contend that Fiedler is not entitled to recover amounts beyond those provided in the contract due to unexpected difficulties. Reliance is placed on the principle that

> [w]here one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered.

*United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918). Defendants contend that Fiedler should have protected himself against unexpected occurrences by inserting appropriate provisions in the contract. In the absence of such provisions, it is urged, Fiedler cannot obtain damages for the difficulties encountered.

■ We believe the doctrine cited by defendants is inapplicable to the case before us. This is not a simple case of unanticipated inconveniences, the risks of which a contracting party may be found to have assumed. Rather, Fiedler complained of fraud. He alleged that he was induced to enter a contract by Wenzel's misrepresentations, and that Wenzel knew the true state of affairs. In short, Fiedler's theory was that the difficulties he encountered, although unforeseen by him, were *not* unforeseen by the defendants. A party does not assume the risk of fraud. Inasmuch as there was sufficient evidence to support the jury's acceptance of Fiedler's theory of fraud, we do not agree that Fiedler can be said to have simply assumed a normal contract risk of unanticipated difficulties.

Defendants next assert that the evidence was insufficient to justify a verdict and judgment for breach of contract due to the delays in gaining access to the landowners' property in the process of removing the pipeline. Fiedler's theory was that the defendants were obligated to facilitate his entry onto the lands of others, but that they failed to do so. He testified that these delays amounted to thirty-six days. Defendants acknowledge that delays occurred, but they contend that the contract did not require the defendants to ensure Fiedler's access to the pipeline. They also suggest that delays were inherent in the nature of such work and that, in any event, Fiedler could always straighten previously removed pipe when he was unable to remove additional portions of the pipeline.

The provision of the parties' contract most relevant to the dispute on this issue provides:

> Fiedler shall backfill any ditches and clean up rights-of-way in a workmanlike manner; however, any damages sustained to any of the landowners property, whether real or personal, while Fiedler is performing this contract in a workmanlike manner, shall be the sole responsibility and liability of Karsten-McKea.

Record, vol. 3, at 383. Although this provision does not appear to require Karsten-McKea to provide personnel for the purpose of keeping the right-of-way open, it does require something of significance: payment to landowners for damages. At least one aspect of Fiedler's theory of delay was that it was in part caused by Karsten-McKea's failure to meet this payment obligation. Testimony was produced at trial to indicate that landowners became unwilling to admit Fiedler after they discovered that other landowners had not been paid for damages suffered by the removal operation.

In addition to the payment problems, the evidence at trial suggested that the parties had some understanding that defendants were responsible for access to the pipeline. Thus, there was testimony that Karsten had undertaken the responsibility of securing access to the pipeline in the early stages of the project. In addition, a defense witness with 25 years experience in the "pipe business" testified that the usual practice in such projects was to have the owner of the easement—in this case defendant Kar-

sten—acquire access to the landowner's property.

■ Although we do not find the evidence on this issue overwhelmingly in favor of Fiedler, it was certainly sufficient to support the jury's verdict.

The defendants' next argument focuses on the extent of actual damages awarded Fiedler by the jury. They contend that there was insufficient evidence to support an award of $100,000 in damages. In addition, defendants contend that the award exceeded the maximum amount permitted under Oklahoma law.

Defendants' basic contention regarding evidentiary sufficiency for damages is that many of Fiedler's claimed losses were too speculative to be allowed. The emphasis in this regard is on the newness of Fiedler's business and the claimed inadequacy of proof regarding equipment rental value and extra labor costs. Fiedler's testimony regarding what defendants curiously refer to as "lost profits," was simply conjectural, it is argued.

Fiedler asserted three distinct causes of action at trial. First, he claimed entitlement on the contract to amounts unpaid for work performed. Second, he sought recovery for the delays allegedly resulting from defendants' failure to provide access to the pipeline. The third cause of action was for fraud. The $100,000 jury award was not expressly allocated among the causes of action.

■ Except as to the amount due on the contract for work performed, essentially the only evidence of the losses incurred by Fiedler was testimony by Fiedler himself. Although defendants complain that this testimony was "self-serving," that alone does not mean it was incompetent. Without objection, Fiedler testified as to the rental value of his equipment and his labor costs. Given Fiedler's experience in such work, we see no insufficiency in this evidence. Although defendants now assert that Fiedler's figures were high, they did not seek to refute them at trial through expert testimony or otherwise. Fiedler also testified re-

garding the appropriate amount of payment for the pipeline project as conditions were, rather than as represented. Although we acknowledge that Fiedler's claimed damages were not without uncertainty, we note that mathematical exactness is not required. The difficulty of calculating Fiedler's damages should not bar awarding them since there was sufficient proof, accepted by the jury, that Fiedler was damaged by defendants. *See, e. g., Shannon v. Shaffer Oil & Refining Co.*, 51 F.2d 878, 881–82 (10th Cir. 1931); *George v. Greer*, 207 Okl. 494, 250 P.2d 858, 860 (1952).

Defendants' other main contention on the question of damages relates to the scope of Okla.Stat.Ann. tit. 23, § 96 (West 1955). It provides:

> Notwithstanding the provisions of this chapter, no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides, except in cases where recovery may be for exemplary damages and penal damages . . . . .

Defendants argue that inasmuch as Fiedler was awarded no punitive damages the $100,000 award violated this provision by exceeding the amount he could have obtained for full performance of the parties' contract. Defendants contend that full performance could have brought Fiedler no more than $54,680.

■ Fiedler seeks to avoid the force of this argument by relying on *Knupp v. Hubbard*, 130 Okl. 111, 265 P. 133 (1928), a case dealing with the predecessor of § 96. The Oklahoma Supreme Court recognized in *Knupp* that there were exceptions to this damage limitation rule. The current scope of *Knupp* is not entirely clear, but it does suggest that the § 96 limitation will not apply in all cases. Aside from this consideration, there is one other in Fiedler's favor. Strictly speaking, it is doubtful that a cause of action for fraud can be considered one for "breach of an obligation" under the statute. Section 96 describes "an obligation" as something that can be fully performed "on both sides." A cause of action

for misrepresentation is not one for breach of such an obligation, or contract; it is an action for false inducement to enter into the obligation in the first instance. We do not regard § 96 as applicable to the cause of action for misrepresentation. Inasmuch as the damages were not allocated according to the causes of action, and given the maximum amount of fraud damages the jury could have awarded based on the record before it, we are unable to say that § 96 was violated in this case.[2]

Defendants' remaining contentions relate to the propriety of verdicts against Naturita Supply Company, Robert Wenzel, and, to the extent that the verdict is based on misrepresentation, M. E. Karsten. Although defendants' arguments are not without appeal, any error in this connection is not properly before us.

[10, 11] The trial court instructed the jury that the defendants were engaged in a "joint venture," and that each defendant was bound by the acts of the others. Record, vol. 1, at 261. In light of this instruction, the jury was authorized to assess damages against all the defendants. In effect, then, defendants' contentions amount to a challenge to the court's "joint venture" instruction. But no objection appears to have been made to the instruction.[3] In the absence of such an objection, we will not review the propriety of the instruction given. See Fed.R.Civ.P. 51; 9 C. Wright & A. Miller, *Federal Practice and Procedure* §§ 2553, 2558 (1971).[4]

We decline to disturb the trial court's order disallowing Fiedler prejudgment in-

terest and attorney fees. The judgment below is affirmed.

2. Since special interrogatories were not employed nor the general award broken down by cause of action, it is conceivable that the jury did not award substantial damages for misrepresentation, but only for breach of contract. If this were clear, the award would seem to be at odds with § 96. However, if a general award of damages can be sustained on any permissible theory, it must be affirmed. In this case, the jury, on the evidence before it, could have awarded damages for misrepresentation alone in an amount in excess of the $100,000 actually awarded. Seen from this perspective, the award can be sustained as an appropriate award of damages for misrepresentation, and

resort need not be had to whether the damages are sustainable in light of § 96 on a breach of contract theory.

3. Neither did defendants request special interrogatories to the jury on the allocation of damages, or any other instructions seeking to distinguish among the defendants.

4. An erroneous instruction might be reviewable even without an objection below if it amounted to "plain error." No such error appears on this record. There was some evidence of involvement by all named defendants in a relationship with Fiedler.