**Philip ORTEGA, Plaintiff,**

v.

**CITY OF KANSAS CITY, KANSAS, a Municipal Corporation, et al., Defendants.**

**Civ. A. No. 85–2054.**

United States District Court, D. Kansas.

March 18, 1987.

Richard T. Merker, Thomas D. Billam, Wallace, Saunders, Austin, Brown & Enochs, Overland Park, Kan., for plaintiff.

Maurice J. Ryan, J. Dexter Burdette, Kansas City, Kan., for defendants.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter is before the court upon the following motions: (1) defendants' motions for judgment notwithstanding the verdict, new trial and/or remittitur; (2) plaintiff's motion for attorney's fees; and (3) defendants' motion for review of the clerk's taxation of costs.

Trial to a jury was held on December 17–22, 1986. Plaintiff presented evidence as to the following: In the fall of 1984, defendants initiated a sting operation entitled "Operation Express" to facilitate the arrest of a large number of suspects for which outstanding warrants existed. A computer operator for the Kansas City, Kansas, Police Department was given a list of names for which outstanding warrants existed. She entered the suspects' names into the computer and it displayed an address for each suspect. Notices were then mailed to the suspects telling them to claim a package in Kansas City, Kansas. One of the outstanding warrants was for a "Philip Ortega," residing on Indiana Street in Kansas City, Missouri. Although the warrant did not so identify the suspect, he was a 35–year–old black male. When the computer operator entered Ortega's name into the computer, two addresses were displayed: one at the Indiana Street address and another at a 90th Terrace, Kansas City, Missouri address. Notices were sent to both addresses.

The plaintiff, Philip Ortega, a 65–year–old white male, received the notice at his home on 90th Terrace in Kansas City, Missouri, on December 24, 1984. On December 26, plaintiff crossed the Missouri-Kansas state line into Kansas City, Kansas, to pick up his package, whereupon he was arrested despite his protests that he was the "wrong" Philip Ortega. Plaintiff was booked at the Wyandotte County Jail, taken before a District Judge and released on bond. Several days later, after obtaining counsel, plaintiff convinced the judge that he was in fact not the same Philip Ortega sought in the warrant. Although the judge told plaintiff that the charges would be dismissed, no entry of dismissal was ever entered into the record.

At the close of plaintiff's evidence, the court directed a verdict on all claims except plaintiff's claim under 42 U.S.C. § 1983 for a violation of his constitutional right to extradition. The jury was instructed that a criminal suspect has a right to extradition under Article IV, Sec. 2, cl. 2 of the United States Constitution and that this right is implemented by both state and federal extradition statutes which provide specific procedures for extraditing persons charged with a crime. The jury was further instructed that they could find a defendant liable under section 1983 if they found that the defendant lured plaintiff into Kansas and arrested and detained him in violation of the extradition laws.

The jury returned a verdict in favor of plaintiff against the City of Kansas City, Kansas, [hereinafter "the City"] and three of the individual defendants. The jury awarded compensatory damages in the amount of $12,500 and punitive damages totalling $70,000 against the individual defendants.

I. *Defendants' Motions for Judgment Notwithstanding the Verdict, New Trial and/or Remittitur.*

A. *Motion for Judgment Notwithstanding the Verdict.*

In *Flood v. Wisconsin Real Estate Investment Trust,* 503 F.Supp. 1157 (D.Kan. 1980) we discussed the proper standard to be applied to a motion for judgment notwithstanding the verdict:

> In considering a motion for a judgment n.o.v. the evidence must be viewed in the light most favorable to the party against whom the motion is made. A judgment n.o.v. may [not] be granted unless the evidence points but one way and is susceptible to no reasonable inferences which may sustain the position of the party against whom the motion is made. It is not the Court's duty to weigh the evidence presented, or to pass on the credibility of witnesses, or to substitute its judgment of the facts for that of the jury.

*Id.* at 1159 (citations omitted).

The court has carefully reviewed the evidence presented at trial and the issues of fact that were to be determined. The court finds that the record contains sufficient evidence to support the jury's findings. Defendants' motion for judgment notwithstanding the verdict will therefore be denied.

B. *Motion for New Trial.*

The standard for granting a new trial is less rigorous than the standard for granting judgment notwithstanding the verdict. In ruling on a motion for a new trial, the trial judge has extremely broad discretion. *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 37, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980). We recently set forth the standard for granting a motion for a new trial in *Commons v. Montgomery Ward & Co.,* 614 F.Supp. 443 (D.Kan.1985):

> [T]he trial judge has the obligation or duty to ensure that justice is done, and, when justice so requires, he has the authority to set aside the jury's verdict. He may do so when he believes the verdict to be against the weight of the evidence or when prejudicial error has entered the record. In considering a motion for new trial, the court is permitted to weigh the evidence and it may order a new trial even if there is evidence to support the jury's verdict.

*Id.* at 449 (citations omitted).

Defendants raise numerous arguments in support of their motion for new trial. The

court will address each of these arguments individually.

### 1. *Qualified Immunity.*

Defendants argue that the court erred in holding that the individual defendants were not entitled to the defense of qualified immunity. The doctrine of qualified immunity provides that "governmental officials performing discretionary functions ... are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In *Harlow,* the court reformulated the standard for determining qualified immunity. Prior to *Harlow,* the qualified immunity test had two prongs: one objective and one subjective. *See, e.g., Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). Because the Court became concerned that the subjective or so-called "good faith" component entailed wide-ranging discovery into the official's motivation, the Court in *Harlow* eliminated the subjective prong and any need to inquire as to whether the official was acting in good faith. *See Harlow,* 457 U.S. at 816–17, 102 S.Ct. at 2737.[1]

In *Lutz v. Weld County School District,* 784 F.2d 340 (10th Cir.1986), the Tenth Circuit analyzed the *Harlow* decision and set forth the steps for determining whether a defendant is entitled to the qualified immunity defense. Initially, defendants must properly raise the defense of qualified immunity, *i.e.,* they must assert that they were performing discretionary functions. *Id.* at 342. Plaintiff then has the burden to convince the court that the law relied upon by plaintiff was clearly established at the time the defendants allegedly deprived plaintiff or his or her civil rights. *Id.* at 342–43. Whether the law was clearly established when the conduct complained of occurred is a legal issue to be resolved by the court. *Id.* at 343. If a plaintiff fails to

convince the court that the law was clearly established, the defendants are qualifiedly immune and the court must enter judgment in favor of the defendants who have pled the defense. *Id.* If, on the other hand, the plaintiff convinces the court that the law was clearly established, the court must proceed to determine whether the defendants have raised a fact issue as to whether "exceptional circumstances" existed such that reasonable persons in their position would not have known of the relevant legal standard. *Id.* If the defendants raise such a fact issue, the defendants are entitled to a jury instruction on the defense. If no fact issue is raised, defendants are not entitled to the defense as a matter of law. *Id.*

We will proceed to apply each of these steps to determine whether the defendants were entitled to the defense of qualified immunity. Initially, the court finds that defendants properly raised the defense. Decisions as to when and how to execute arrest warrants and whether to initiate sting operations such as Operation Express are matters clearly within the discretionary authority of a police department and its officers.

We must next decide whether plaintiff has met his burden in convincing us that the law was "clearly established" at the time of the defendants' wrongful conduct. As a threshold matter, we must decide the standard for determining whether the law was "clearly established." In *Harlow,* the court declined to decide whether the state of the law is to be evaluated by reference to opinions of the Supreme Court, Courts of Appeals, or the local District Court. 457 U.S. at 818 n. 32, 102 S.Ct. at 2738 n. 32.

In the absence of clear-cut guidance from the Supreme Court, courts have taken varying approaches in defining the "clearly established" standard. According to the Ninth Circuit, the court should look for binding precedent on any level; in the absence of such precedent, the court should look to all available decisional law, includ-

---

**1.** Because the Court in *Harlow* clearly rejected the "good faith" analysis, we need not address

any of defendants' good faith arguments.

ing decisions of state courts, circuit courts and district courts. *Chilicky v. Schweiker,* 796 F.2d 1131, 1138 (9th Cir.1986); *Capoeman v. Reed,* 754 F.2d 1512, 1514 (9th Cir.1985). The court should also evaluate the likelihood that the Supreme Court or applicable circuit court would have reached the same result as the courts that have already addressed the issue. *Chilicky,* 796 F.2d at 1138.

The Third Circuit has recognized the ambiguous nature of the "clearly established" standard, *see People of Three Mile Island v. Nuclear Regulatory Commissioners,* 747 F.2d 139, 144 (3d Cir.1984), and has yet to set forth a specific standard. In a recent case, however, the Third Circuit examined other Third Circuit cases to determine whether the rights were clearly established. *See Sourbeer v. Robinson,* 791 F.2d 1094, 1103 (3d Cir.), *petition for cert. filed,* 55 U.S.L.W. 3186 (U.S. Sept. 12, 1986). The Court of Appeals for the District of Columbia has also refused to formulate a detailed rule. It recognizes, however, that Supreme Court precedent "clearly establishes" the law. *See Hobson v. Wilson,* 737 F.2d 1, 26 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). The circuit has not had the opportunity to further define what amounts to well established law because, as it notes, the cases to come before it have been at the extreme ends of the spectrum where the illegality of the conduct alleged was established "by any reasonable definition of the phrase." *Id.; Zweibon v. Mitchell,* 720 F.2d 162, 169 (D.C.Cir.1983), *cert. denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984).

Similarly, the Seventh Circuit has declined to formulate a specific rule. Generally speaking, it encourages the trial court to look to cases from all levels of the federal courts and from a variety of jurisdictions. *See Crowder v. Lash,* 687 F.2d 996, 1001–02 (7th Cir.1982). On the other hand, the District Court for the District of New Jersey has adopted a strict rule. It holds that the law is clearly established if an unrefuted published district court opinion exists within the district where the defendants alleged wrongful conduct occurred. *See James v. Price,* 602 F.Supp. 843, 846–47 (D.N.J.1985).

■ Although we are unable to synthesize a specific rule from these cases that would apply to all actions, they do provide some guidance. Without a doubt, a Supreme Court case on point would "clearly establish" the law. We also believe that an opinion from the Circuit Court of Appeals in which the defendants' conduct occurred would satisfactorily establish the law, especially if the opinion was in line with a majority of other courts.

Applying these general guidelines to the case before us, we first find that no Supreme Court precedent exists concerning section 1983 claims for the violation of extradition rights. There is, however, appellate level precedent. The Tenth Circuit in 1974 held that "[a] complaint which charges abuse of the extradition power by noncompliance with applicable law states a claim under 42 U.S.C. § 1983." *Sanders v. Conine,* 506 F.2d 530, 532 (10th Cir.1974). The Tenth Circuit's holding is in accord with all but one of the circuit courts that have addressed this issue prior to the time the defendants' wrongful conduct occurred.[2] *See Ross v. Meagan,* 638 F.2d 646, 649–50 (3d Cir.1981); *Crumley v. Snead,* 620 F.2d 481, 483 (5th Cir.1980); *Brown v. Nutsch,* 619 F.2d 758, 764 (8th Cir.1980); *McBride v. Soos,* 594 F.2d 610, 613 (7th Cir.1979); *Wirth v. Surles,* 562 F.2d 319, 423 (4th Cir.1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978). The Sixth Circuit is the only appellate court that has declined to recognize a section 1983 cause of action for violation of extradition rights. *See Stockwell v. Friberg,* 272 F.2d 386, 386 (6th Cir.1959). *See also Martin v. Sams,* 600 F.Supp. 71, 72 (E.D.Tenn.1984).

---

**2.** The Tenth Circuit's decision in *Sanders* continues to be in accord with the majority of federal appellate courts. The Ninth Circuit recently addressed this issue and held that a violation of extradition laws may serve as the basis for a section 1983 claim. *See Draper v. Coombs,* 792 F.2d 915, 919 (9th Cir.1986).

■ We conclude that, in 1984, when the defendants' wrongful conduct occurred, the law was clearly established that plaintiff had a right to extradition protected by section 1983. The Tenth Circuit's decision in *Sanders* is binding precedent. Reasonable police officers conducting police activities in this circuit should have known that the *Sanders* case was the applicable law in 1984 and should have patterned their conduct in accordance with it. Given that the *Sanders* rule is clearly the majority rule, reasonable officers would have had no reason to doubt its validity or seriously question whether the United States Supreme Court would hold the same way if confronted with the same issue.

Having decided that the *Sanders* case was the well established law, we must next decide an even more perplexing issue: Are the facts in *Sanders* sufficiently similar to those in the instant case? The court in *Harlow* suggested that there must be some factual correlation between the applicable precedents and the case at issue. As the court noted in *Harlow*, a public official should not be required to "anticipate subsequent legal developments" or to know that "the law forbade conduct not previously identified as unlawful." 457 U.S. at 818, 102 S.Ct. at 2738.

Again, in the absence of clear guidance from the Supreme Court, courts have taken differing approaches to this issue. Some courts have required a strict factual identity between the "establishing" case and the case at issue. *See, e.g., National Black Police Assoc. v. Velde,* 712 F.2d 569, 576 (D.C.Cir.1983), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984); *Saldana v. Garza,* 684 F.2d 1159, 1165 (5th Cir.1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983); *Piccollela v. Rieck,* 555 F.Supp. 27, 28 (S.D.N.Y. 1982). Other courts have required only that the officials know and apply general legal principles in appropriate factual settings. *See, e.g., Hicks v. Feeney,* 770 F.2d 375, 379–80 (3d Cir.1985); *Williams v. Bennett,* 689 F.2d 1370, 1381–82 (11th Cir. 1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983); *Anderson v. Central Point School District No. 6,* 554

F.Supp. 600, 608 (D.Ore.1982), *aff'd,* 746 F.2d 505 (9th Cir.1984); *Nakao v. Rushen,* 545 F.Supp. 1091, 1092–93 (N.D.Cal.1982). Still other courts require no factual similarity between the precedent and the case at hand and demand that the defendant anticipate legal developments in accordance with discernible trends in the law. *See, e.g., Forsyth v. Kleindienst,* 551 F.Supp. 1247, 1253–58 (E.D.Pa.1982).

■ We believe the second approach, *i.e.,* requiring officials to know and apply general legal principles, to be the most reasonable and in line with the Court's decision in *Harlow.* This approach strikes the necessary balance between the desire to compensate the victims whose rights have been deprived and the concern that the fear of liability will deter officials from ardently discharging their duties. *See Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736. It is a flexible approach that requires the public official to make only a reasonable inquiry into the general legal principles. It does not require the official to anticipate the evolution of constitutional law, a task that even learned and experienced federal judges frequently have difficulty performing. *See McSurely v. McClellan,* 753 F.2d 88, 100 (D.C.Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985). On the other hand, it does not allow the official to escape liability merely because of a factual wrinkle in a case. To insist on a precise factual correspondence between the case at issue and the reported case law would be tantamount to giving every official license to commit one liability-free violation of a constitutional or statutory right. *See People of Three Mile Island v. Nuclear Regulatory Commissioners,* 747 F.2d 139, 145 (3d Cir.1984).

Applying this flexible rule to the case at hand, we conclude that the individual defendants should have known and applied the general legal principle set forth in *Sanders* to the facts of this case. As we noted above, *Sanders* established a general rule that an official who abuses the extradition process by failing to comply with "applicable law" is liable under section 1983. 506 F.2d at 532. The "applicable

law" at issue in *Sanders* included not only Article IV of the Constitution, but also its implementing federal statute, 18 U.S.C. § 3182, and the state of Wyoming's Uniform Extradition Act. The state of Kansas has adopted an almost identical version of the Uniform Criminal Extradition Act. *See* K.S.A. 22–2701, *et seq.* Consequently, the individual defendants in this case easily should have known that their failure to comply with Kansas extradition laws would make them amenable to suit under section 1983.

Notwithstanding the fact that the *Sanders* decision dealt with almost identical state laws, defendants argue that the case is too factually dissimilar to apply to the instant action. In *Sanders*, the section 1983 plaintiff sued the asylum state for failing to comply with the state's extradition statutes. Plaintiff alleged that he was arrested in the asylum state without a warrant, that he was refused a lawyer, and never taken before a judge as required by the asylum state's extradition laws. He was then extradited to another state on the charges. In contrast, the plaintiff in the case at hand, was never arrested in the asylum state. Instead, defendants' sting operation "enticed" or "lured" plaintiff to cross the state line in violation of Kansas extradition laws and plaintiff was arrested only after he had arrived in the state of Kansas. Defendants argue that these two specific factual dissimilarities preclude the application of *Sanders*. We do not agree with defendants' arguments and find that these dissimilarities are immaterial.

*Sanders* set forth a general rule that violation of a state's extradition laws is actionable under section 1983. The court's opinion was not necessarily restricted narrowly to the facts of that case. Furthermore, the *Sanders* court held that state extradition laws benefit the individual and not the state. *Id.* Regardless of whether a suspect is "lured" across state lines, or brought over by state authorities after arrest in the asylum state, the same damage results to the individual. In either case, he is deprived of the benefits and procedural protections afforded by the Uniform Criminal Extradition Act. In sum, we find that *Sanders* is sufficiently similar to the case at bar to hold the individual defendants accountable for having knowledge of the case and applying its general legal principles to the facts at hand.

■ Furthermore, we find that the Kansas Uniform Criminal Extradition Act, K.S.A. 22–2701 *et seq.*, was itself clearly established at the time the defendants' wrongful conduct occurred. The Kansas Legislature enacted the Uniform Criminal Extradition Act in 1937, as drafted by the National Conference of Commissioners on Uniform State laws. Preliminary Note, Judicial Counsel, Article 27, Kansas Statutes Annotated. Only a few amendments have been made since that time. *Id.* The Act sets forth specific, detailed procedures for arresting and extraditing suspects. These laws clearly provide for the right to extradition prior to arrest. *See* K.S.A. 22–2703 to –2710.[3] These statutes would put a rea-

---

**3.** Pursuant to the Kansas Uniform Criminal Extradition Act, the Governor of any state (in this case Missouri) has the duty to arrest and deliver to the executive authority of Kansas any person charged in Kansas with a crime who has fled from justice into Missouri. *See* K.S.A. 22–2702. In order to bring about the extradition of a person charged to Kansas, the executive authority of Kansas must inform the Governor of Missouri in writing that the accused was present in Kansas at the time of the commission of the alleged crime and that he thereafter fled from Kansas. This written notice must be accompanied by an indictment or an affidavit made before a Kansas magistrate or judge, and an arrest warrant. The affidavit must substantially charge the person with having committed a crime in Kansas, and the copy of the affidavit

must be authenticated by the executive authority of Kansas. K.S.A. 22–2703.
When demand is made upon the Governor of Missouri to surrender the accused to Kansas authorities, the Governor may investigate the demand and determine the situation and circumstances of the accused and whether he ought to be surrendered. K.S.A. 22–2704. If the Governor of Missouri determines that the demand should be complied with, he must sign an arrest warrant and direct peace officers in the state of Missouri to arrest the accused. The warrant must substantially recite the facts necessary to the validity of its issuance. K.S.A. 22–2707.
After the accused is arrested, he must be taken before a Missouri judge who must inform the accused of the charges and the right to counsel.

sonable police chief and officers on notice that using a sting operation to "lure" or "entice" a suspect across state lines for the purpose of arresting him would violate the extradition act.

■ We recognize that in the ordinary case, an official's violation of clearly established *state* statutes does not deprive an official of qualified immunity. *See Davis v. Scherer,* 468 U.S. 183, 194–96, 104 S.Ct. 3012, 3019–20, 82 L.Ed.2d 139 (1984). When, however, the state statute is itself the basis of the suit, *i.e.,* when the state statute creates the cause of action under section 1983, then the officials' violation of the statute, if clearly established, will defeat immunity. *Id.* at 194–95, 104 S.Ct. at 3019. The instant action is one of those rare cases in which the state statute, *i.e.,* the Kansas Uniform Criminal Extradition Act, is in fact the basis for the section 1983 claim.

In light of the foregoing, we hold that plaintiff has met his burden in convincing us that both the case law and the statutory law were so well established that reasonable persons in the place of the defendants would have known that they were violating the plaintiff's federally protected rights to extradition. Since plaintiff has convinced us that the law was clearly established, we must proceed to determine whether defendants raised a sufficient fact issue as to whether "exceptional circumstances" existed such that a reasonable police chief and officers in the defendants' position would not have known of the relevant legal standard.

■ Defendants argue that their reliance on the advice of the United States Postal Inspector, United States Postmaster and Wyandotte County District Attorney raised sufficient evidence of "extraordinary circumstances" to require submission of this issue to the jury. This court has previously held that reliance on the advice of counsel in certain circumstances rises to the level of extraordinary circumstances.

*See Burk v. Unified School District No. 329,* 116 F.R.D. 16 (D.Kan., 1987). The court, however, does not find that sufficient evidence existed in the instant case to permit the jury to decide the issue given that (1) the advice sought by defendants from the United States Marshal Service was limited to the Marshal's prior involvement in other sting operations; (2) the advice sought from the United States Postmaster was whether the postal service would take part in the sting or would allow the police officers to masquerade as postal employees; and (3) the advice sought from the District Attorney was whether his office would cooperate in clearing out a large number of outstanding warrants. There was simply no evidence that the defendants asked the staff of the City Attorney's office for legal advice as to the propriety of mailing notices to out-of-state suspects, nor was there evidence that the defendants questioned the District Attorney about this issue. Consequently, we hold that we properly refused to allow the jury to decide whether defendants were entitled to qualified immunity under the "extraordinary circumstances" exception.

In light of the foregoing analysis, the court concludes that no error occurred when the court determined at trial that defendants were not entitled to the defense of qualified immunity. Defendants' motion for new trial based on the qualified immunity doctrine will therefore be denied.

### 2. *Good Faith.*

■ Defendants make a related argument that the court erred in sustaining plaintiff's counsel's objections to defendants' counsel's good faith closing arguments and in admonishing the jury that good faith was not an issue in the case. Defendants support their argument with no authority. As we discussed above in part one, the "good faith" of a defendant official is no longer a defense to unconstitutional conduct. *See Harlow v. Fitzgerald,* 457 U.S. 800, 816–17, 102 S.Ct. 2727,

---

If the accused states that he desires to test the legality of his arrest, he may apply for a writ of habeas corpus. The authorities from Kansas are notified, and a hearing is held in the Mis-souri court on the suspect's writ. If the writ is denied, the suspect is turned over to the Kansas authorities. If the writ is granted, the accused is released. K.S.A. 22–2710.

2737, 73 L.Ed.2d 396 (1982). Defendants' argument is therefore totally without merit. Defendants' motion for new trial based on this issue will be denied.

### 3. *Municipal Policy.*

■ Defendants argue that there was insufficient evidence for the jury to infer that a municipal policy existed to deprive the plaintiff of his right to extradition. Liability may be imposed on a city only for injuries inflicted pursuant to municipal "policy or custom." *Monnell v. New York City Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). This requirement is intended to prevent imposition of municipal liability under circumstances where no wrong may be ascribed to the municipal policymakers. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 821, 105 S.Ct. 2427, 2435, 85 L.Ed.2d 791 (1985). The word "policy" generally "implies a course of action consciously chosen from among various alternatives." *Id.* at 823, 105 S.Ct. at 2436. At a bare minimum, an affirmative link must exist between the policy and the particular wrongful conduct alleged such that the particular policy is the "moving force" behind the wrongful conduct. *Id.* Accordingly, municipal liability under section 1983 attaches where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469, ——, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986). In those circumstances, municipal liability may attach to a single decision to take unlawful action. *Id.*

Applying these standards to the case before us, we have little difficulty concluding that the evidence was sufficiently substantial for the jury to determine that a municipal policy or custom existed. First, sufficient evidence existed upon which a jury could find that the defendant police chief, Allan Meyers, was responsible for setting City policy concerning the execution of City arrest warrants. There was no evidence that the legislative body of the City of Kansas City, Kansas, was required to legislate policy concerning the arrest of criminal suspects. Second, sufficient evidence existed that Chief Meyers took a deliberate course of action when he instigated "Operation Express." Defendants' argument that Meyers did not know of all the details of the sting operation does not relieve the City from liability. As the City's chief policymaker concerning arrests, Meyers was responsible for establishing final policy, regardless of how ill-informed his decision may have been. Defendants' motion for a new trial based on a lack of evidence to support the City's liability will therefore be denied.

### 4. *Compensatory Damages.*

Defendants seek a new trial on the issue of damages or, in the alternative, a denial of a new trial conditioned upon plaintiff's consent to a remittitur. The jury in this case awarded plaintiff $12,500 in compensatory damages for the deprivation of plaintiff's right to extradition. Defendants argue that these damages are excessive in light of the fact that the evidence showed only a loss of $280.00 in out-of-pocket expenses and no evidence of substantial mental anguish or emotional distress.

■ The Tenth Circuit has held that "absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or another improper cause invaded the trial, the jury's determination of the amount of damages is inviolate." *Lane v. Gorman,* 347 F.2d 332, 335 (10th Cir.1965). *Accord Corriz v. Naranjo,* 667 F.2d 892, 898 (10th Cir.1981), *cert. dismissed,* 458 U.S. 1123, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982). The fact that the damages awarded might strike us as high is not sufficient to warrant a new trial or a remittitur. *Rosen v. L.T.V. Recreational Development, Inc.,* 569 F.2d 1117, 1123 (10th Cir.1978).

■ We hold that defendants have failed to affirmatively show in their motion specific facts and circumstances from which we may infer that the jury was influenced by passion, prejudice or bias. Nor

do we find the award so grossly excessive as to shock the court's conscience. Although the evidence established only a small amount of out-of-pocket expenses, there was sufficient evidence to support a larger award for damage to plaintiff's reputation and for embarrassment, humiliation and/or mental anguish. *See Memphis Community School District v. Stachura,* — U.S. ——, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986). It was not necessary for plaintiff to provide medical or psychiatric testimony in order for the jury to determine that plaintiff had suffered embarrassment or anguish. Defendants' motion for new trial, or denial of new trial conditioned upon remittitur, will therefore be denied.

### 5. *Punitive Damages.*

Defendants also seek a new trial, or denial of new trial conditioned upon remittitur, on the grounds that the punitive damages awarded by the jury were excessive, were not supported by the evidence and were the product of passion and prejudice. We will address defendants' motion in light of the same standards discussed above in part four. *See Zarcone v. Perry,* 572 F.2d 52, 56 (2d Cir.1978).

The jury awarded punitive damages against Police Chief Meyers in the amount of $40,000; Detective Randall Murphy in the amount of $10,000; and Lt. Ronald L. Miller in the amount of $20,000. The jury was instructed that they could award punitive damages against a particular defendant if the defendant's conduct was shown to be motivated by "evil motive or intent" or if it involved "reckless or callous indifference" to the civil rights of the plaintiff. *See Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).

Defendants first argue that there was no evidence to show that the defendants acted with evil motive or intent. We must agree. Defendants further argue that there was no evidence to show that the defendants acted in reckless or callous disregard of plaintiff's rights, given that the defendants sought advice from the United States Marshal Service, the United States Postmaster and the Wyandotte County District Attorney. Here, we must disagree. As noted above in part one of this opinion, the advice sought by defendants dealt with other aspects of the sting operation and not with the propriety of bringing in and arresting out-of-state suspects. As we discussed earlier, the defendants should have known that mailing their notices out of state to entice suspects into the state of Kansas would violate the suspects' rights to extradition or, at the very least, should have been on notice to have asked for specific advice as to the legality of their actions. We conclude that the defendants' failure to do so reasonably could be construed by the jury as acting in reckless disregard of the plaintiff's rights.

Defendants also argue that the amount of punitive damages was so excessive that it should shock the conscience of the court. We do not agree. We find that the punitive damages awarded bear a reasonable relationship to the actual damages awarded, the nature of the defendants' acts and the defendants' relative culpability. The amount awarded may also be characterized as reflecting the jury's desire for meaningful punishment and effective deterrence. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 266–67, 101 S.Ct. 2748, 2759, 69 L.Ed.2d 616 (1981).

Additionally, defendants argue that the punitive damages were excessive given the defendants' moderate financial status and the lack of evidence as to the defendants' financial assets. It is well settled that a defendant's assets may be considered by the jury in determining the amount of punitive damages. *See, e.g., Kerr v. First Commodity Corp. of Boston,* 735 F.2d 281, 289 (8th Cir.1984); *Professional Seminar Consultants, Inc. v. Sino American Technology Exchange Council, Inc.,* 727 F.2d 1470, 1473 (9th Cir.1984). However, it is the *defendant* who has the burden of showing his modest means if he wishes them considered in mitigation. *Zarcone v. Perry,* 572 F.2d 52, 56 (2d Cir.1978); *Tri-Tron International v. Velto,* 525 F.2d 432, 437–38 (9th Cir.1975). A defendant who chooses not to offer such proof, despite his awareness of potential liability, is

not entitled to a new trial or to have the verdict set aside, based on his failure to present evidence of his financial status. *Zarcone*, 572 F.2d at 56.

Finally, defendants assert that the punitive damages awarded were the result of an erroneous argument made by plaintiff in closing to the effect that the officers would not be personally liable for any punitive damage awards. We recognize that such an argument was probably improper and possibly may have been considered by the jury. However, we must agree with plaintiff that defendants' belated objections come too late. Defendants had the opportunity to object to plaintiff's counsel's remarks, and yet, defendants failed to object either during argument or at a bench conference immediately following argument. Defendants also failed to move for a mistrial before the case was submitted to the jury.

■ It is well established that a defendant's failure to object at trial or to move for a mistrial forecloses the defendant from raising the issue as grounds for a new trial. *See, e.g., Computerized Systems Engineering, Inc. v. Qantel Corp.*, 740 F.2d 59, 69 (1st Cir.1984); *Herman v. Hess Oil Virgin Islands Corp.*, 524 F.2d 767, 771–72 (3d Cir.1975); *Brown & Root, Inc. v. Big Rock Corp.*, 383 F.2d 662, 666–67 (5th Cir.1967). We will not allow counsel to play a waiting game to see whether the verdict is favorable before deciding to object to argument for the first time. Nor will we allow defendants to rely on the "plain error" exception to this rule. This is not an exceptional case where a new trial is required to prevent a miscarriage of justice despite defendants' lack of objection at trial. *See* Federal Rule of Civil Procedure 61. *See also Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 609 (1st Cir.1985).

In sum, we hold that the punitive damages awarded were neither excessive nor contrary to the evidence. Nor were they the result of prejudice or passion. Accordingly, defendants' motion for a new trial or, denial of new trial conditioned on remittitur, will be denied with respect to punitive damages.

### 6. *Jury Instructions.*

■ Defendants first assert that the court erred in deleting the word "knowingly" from instruction 9. Defendants' proposed instruction, taken from Devitt and Blackmar, *Federal Jury Practice and Instructions* (3d ed. 1977) § 92.02, read as follows: "Section 1983 ... provides that any inhabitant of this Federal District may seek redress ... against any person or persons who ... *knowingly* subjects such inhabitant to the deprivation of any rights, privileges or immunities, secured or protected by the constitution or laws of the United States." (emphasis added). Defendants argue that the term "knowingly" went to the reasonableness of the officers' belief that they were acting lawfully and not in violation of plaintiff's federally protected rights. We must disagree.

As we discussed above with respect to the doctrine of qualified immunity, whether the officers believed they were acting lawfully is no longer a relevant inquiry under the objective test enunciated in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The language of section 1983 itself contains no "knowingly" language, nor does the case law (as defendants concede) require that the defendants act with specific intent. We therefore hold that no error was committed when the court deleted the word "knowingly" from the defendants' proposed instruction.

■ Second, defendants assert that the court erred in failing to instruct on the mitigation of damages. Specifically, defendants contend that plaintiff incurred unnecessary attorney's fees in defending against the criminal charges and that the jury should have had the opportunity to decide whether plaintiff failed to mitigate his damages. Here again, we must disagree. The mere fact that the District Attorney's Office advised plaintiff that it would dismiss the charges if plaintiff provided it with documentation to support his claim of mistaken identity did not render plaintiff's actions in hiring an attorney unreasonable, especially here where the criminal charges carried the potential for a prison term. We therefore hold that no error

was committed in denying defendants' proposed instruction on the mitigation of damages.

■ Finally, defendants argue that the court erred by misstating the law in the verdict form. Defendants assert that the court's wording of the verdict form implied that the plaintiff was entitled to extradition prior to arrest or requisition by the governor's office. We find defendants' argument totally without merit. Defendants failed to object to the verdict form at trial. Ordinarily, a party waives the right to object to a faulty instruction or verdict form in a motion for new trial if he failed to raise a timely objection before the jury retired. *Lusby v. T.G. & Y. Stores, Inc.*, 796 F.2d 1307, 1311 (10th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 275, 93 L.Ed.2d 251 (1986). Federal Rule of Civil Procedure 51. An exception to this rule allows the court to review the erroneous instruction or verdict form only if it amounted to plain error. *Fiedler v. McKea Corp.*, 605 F.2d 542, 548 n. 4 (10th Cir. 1979). The court is convinced that the verdict form was based on the proper law that related to plaintiff's constitutionally protected right to extradition, *see* discussion *supra* in part one, and that no error, plain or otherwise, occurred here.

### 7. *The Jury.*

■ Defendants' last argument asserts that the court erred in failing to strike Carol Meuhlberger from the jury. Shortly after being impaneled as a juror, Ms. Meuhlberger informed the court that she was a friend of the plaintiff's niece. The court questioned Ms. Meuhlberger concerning her ability to be impartial and then asked for the defendants' position on the issue. The defendants essentially agreed that she could serve based upon her answers. By doing so, defendants waived any right to later object to her serving as a juror. *See* Wright & Miller, *Federal Practice and Procedure* § 2483 at 472–71.

In light of the foregoing, we conclude that defendants have failed to demonstrate sufficient grounds to warrant a new trial or remittitur. They have failed to show that the verdict was against the weight of the evidence, that the damages were excessive, or that prejudicial error entered the record. We are of the opinion that justice has been done in this case. Accordingly defendants' motion for new trial will be denied.

### II. *Plaintiff's Motion for Attorney's Fees.*

Plaintiff originally filed this action against only the City of Kansas City, Kansas. Plaintiff later amended his complaint to join the Chief of Police and six officers of the Kansas City, Kansas, Police Department, the State of Kansas, the Wyandotte County District Attorney, the Board of County Commissioners of Wyandotte County, and the Sheriff of Wyandotte County. Later, the District Attorney, State of Kansas and Board of County Commissioners were dismissed from the action. The case went to trial on ten counts, nine of which were brought against the City and the police chief and officers. Included in these nine counts were claims under section 1983 for deprivation of liberty without due process and deprivation of plaintiff's extradition rights. Also included were tort claims for false arrest and imprisonment, malicious prosecution, assault, battery, negligent investigation and intentional infliction of emotional distress, and a claim for expungement of plaintiff's criminal record. A tenth count was brought against the Sheriff of Wyandotte County, Kansas, for entering false information into the police department's computer.

At the close of plaintiff's evidence, the court directed a verdict in favor of the Sheriff and in favor of the other defendants on all claims except plaintiff's section 1983 claim for violation of his extradition rights. The jury found the City and four of the individual defendants liable. The court entered an order directing all law enforcement officers to expunge the criminal record of plaintiff.

Section 1988 of Title 42 of the United States Code provides that in federal civil rights actions "the court, in its discretion, may allow the prevailing party, other than

the United States, a reasonable attorney's fee as part of the costs." There is no doubt in this case that plaintiff was the prevailing party and that he is entitled to an award of fees. The court must therefore determine the proper amount to be awarded.

### A. Attorney's Fees.

■ Initially, the court must estimate the amount of attorney's fees by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1543, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). This figure is commonly known as the "lodestar figure." The court may then make adjustments to the lodestar figure as necessary in the particular case. *Blum,* 465 U.S. at 888, 104 S.Ct. at 1543.

#### 1. Number of Hours Reasonably Expended.

■ The party seeking an award of attorney's fees must submit evidence supporting the hours worked and rates claimed. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. The district court may exclude from this initial fee calculation hours that were not "reasonably expended." *Id.* at 434, 103 S.Ct. at 1939. The court may consider whether the hours were properly billable and whether adequate records were kept by the party. *Dickerson v. City Bank & Trust Co.,* 590 F.Supp. 714, 717 (D.Kan.1984). After carefully reviewing the time sheets submitted by plaintiff's counsel, the court finds that the majority of hours expended were reasonable and appropriate. However, we do find it necessary to reduce the total number by the number of hours plaintiff spent exclusively pursuing claims against the State of Kansas, the District Attorney, the Board of County Commissioners, and Sheriff Quinn, all of which were dismissed either before trial or at the close of plaintiff's evidence. The court finds that lead counsel reasonably expended 250 hours and associates expended 184.5 hours pursuing claims against the City and its police officers.

### 2. Reasonable Hourly Rate.

■ Reasonable fees under section 1988 must be calculated according to the prevailing market rates in the relevant community. *Blum,* 426 U.S. at 894, 104 S.Ct. at 1546. The fee applicant has the burden of producing satisfactory evidence that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable experience, skill and reputation. *Id.* at 895–96 n. 11, 104 S.Ct. at 1547 n. 11. Plaintiff requests an hourly rate of $130.00 for lead counsel and $85.00 for his associates. The plaintiff has submitted an affidavit from an attorney practicing in the Kansas City area stating that he believes these rates to be the prevailing market rate for comparable services in Kansas City. We are not, however, convinced that these are in fact the prevailing rates. The court itself is familiar with prevailing rates in this area. The court has, in the recent past, awarded fees ranging from an hourly rate of $60.00 to $100.00. *See, e.g., Hawkins v. Heckler,* 608 F.Supp. 1201, 1206 (D.Kan.1985) ($100.00); *Service v. Board of Public Utilities,* No. 83–2206 (D.Kan., *unpublished,* Nov. 13, 1986) ($100.00) [Available on WESTLAW, DCT database]; *Kessler v. Farley,* No. 85–2396 (D.Kan., *unpublished,* Sept. 8, 1986) ($80.00) [Available on WESTLAW, DCT database]; *Liggett v. Kansas Dept. of Administration,* No. 82–4236 (D.Kan., *unpublished,* Aug. 21, 1986) ($75.00); *Larson v. Bowen,* No. 81– 2354 (D.Kan., *unpublished,* July 2, 1986) ($60.00) [Available on WESTLAW, DCT database]. The court has also awarded fees for associates' work at a rate of $75.00. *See Service,* No. 83–2206, slip op. at 5. It is the court's opinion that a reasonable hourly rate in the instant case is $100.00 for lead counsel and $75.00 for associates. Multiplying these hourly rates by the hours expended by each attorney, the court calculates the total amount of attorney's fees to be $38,837.50.

### 3. Assessment of Fees.

#### a. Reduction of the fee award.

■ If a plaintiff does not prevail on all claims for relief, the court must determine

whether a downward adjustment of the lodestar figure is necessary. When the plaintiff fails to prevail on claims "unrelated" to those on which he succeeds, work on the unrelated, unsuccessful claims may not be compensated. *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. These types of claims are to be treated as if they were raised in a separate lawsuit that the plaintiff lost. *Id.* When, however, the plaintiff's claims involve "a common core of facts or [are] based on related legal theories" the court must focus on the significance of the overall relief obtained by the plaintiff. *Id.* If the plaintiff has obtained "excellent results," the attorney's fees should encompass all hours reasonably expended and no reduction should be made merely because the plaintiff failed to prevail on every claim. *Id.* On the other hand, if the plaintiff achieves "only partial or limited success," the product of hours expended on the entire case times a reasonably hourly rate will often be excessive. *Id.* at 436, 103 S.Ct. at 1941. The Supreme Court in *Hensley* stated:

> There is no precise rule or formula for making these determinations. The District Court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment.

*Id.* The Tenth Circuit requires that the trial court consider the results obtained relative to the relief requested, the importance of the issues on which plaintiff prevailed, and whether the claims on which plaintiff prevailed related to unsuccessful claims. *Hernandez v. George,* 793 F.2d 264, 268 (10th Cir.1986).

The court finds in the instant case that plaintiff's claims for relief involved a common core of facts and were based on somewhat related legal theories. Additionally, the court finds that plaintiff obtained most of the relief requested; not only did plaintiff receive compensatory and punitive damages, but he also obtained an order expunging his criminal record. However, the court does not believe this to be a case where the plaintiff has obtained "excellent results," mandating that plaintiff's attorneys receive a fully compensatory fee. Plaintiff's case against the City and its police officers went to trial on nine separate counts. Only one count went to the jury.

In light of the above, the court finds it necessary to reduce the amount of the lodestar figure. Rather than attempt the near-impossible task of identifying certain hours to be eliminated, the court will reduce the award to account for the less than total success. It is the court's equitable judgment that the lodestar amount should be reduced by one-third, resulting in a total attorney fee award of $25,891.40.

b. *Enhancement of the Fee Award.*

Plaintiff's attorneys assert that there is sufficient evidence in the record to warrant upward adjustment of the lodestar figure. Counsel contend that due to the contingency fee arrangement, they bore significant risk of loss in the event that plaintiff's claims were unsuccessful. They also contend that they provided plaintiff with an exceptional quality of representation and that the legal issues were of a novel and difficult nature. Counsel also claim that this case was rather "undesirable" because it involved prosecuting an action against the City of Kansas City, Kansas.

We do not believe that this case merits upward adjustment of the lodestar figure. Upward adjustments of the lodestar calculation are proper only in certain "rare" and "exceptional" cases supported by specific evidence. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* —— U.S. ——, 106 S.Ct. 3088, 3098, 92 L.Ed.2d at 439 (1986); *Blum,* 465 U.S. at 901, 104 S.Ct. at 1550. The burden of proving that an upward adjustment is required is on the fee applicant. *Id.* Most of the reasons offered by plaintiff's attorneys to support upward adjustment are similar to those reasons rejected by the court in *Blum* of "novelty [and] complexity of the issues," "special skill and experience of counsel," "quality of representation," and "results obtained." *Id.* The court in *Blum* held that such factors are fully re-

flected in the lodestar amount and may not serve, as independent bases for increasing the basic fee award. *Id.* at 898, 900, 104 S.Ct. at 1548, 1549. *Accord, Delaware Valley,* 106 S.Ct. at 3098.

The court therefore holds that no upward adjustment of the lodestar figure is required. Plaintiff's counsel will be awarded attorney's fees in the amount of $25,891.40.

### B. *Paralegal Fees.*

 In addition to awarding the prevailing party attorney's fees, we may also award fees for paralegal time reasonably spent on the case. *Ramos v. Lamm,* 713 F.2d 546, 558–59 (10th Cir.1983). Plaintiff has requested an award of fees for 195.5 hours at an hourly rate of $50.00.

 The affidavit submitted on behalf of plaintiff states that $50.00 is a reasonable hourly rate for paralegal time in the Kansas City Area. The court is not convinced, however, that it is in fact reasonable. We have addressed the issue of paralegal fees in only a small number of cases. In those cases we awarded fees at $30.00 an hour (*see Powell v. Control Data Corp.,* No. 83–2154 (D.Kan., *unpublished,* Apr. 22, 1985) [Available on WESTLAW, DCT database]) and $25.00 an hour (*see Seymour v. Clemens & Green, Inc.,* No. 82–2237 (D.Kan., *unpublished,* March 13, 1984) [Available on WESTLAW, DCT database]). The court recognizes that these cases are several years old and that some increase in the rate may be justifiable. The court finds $35.00 to be an appropriate hourly fee for paralegal services.

Defendants argue that the number of hours requested for paralegal time should be reduced because the paralegal's presence at trial was unnecessary. We must agree. Two attorneys were present at all times during the trial. We can see no need in this type of case for the additional presence of a paralegal. The court will therefore deduct the number of hours the paralegal spent at trial from the requested number, resulting in a total of 151.5 hours. The court will further reduce this number by one-third to account for the plaintiff's less than total success. Plaintiff will be awarded a total of $3,535.00 in paralegal fees.

### C. *Conclusion.*

In sum, the court holds that plaintiff is entitled to a total award of $29,426.40 for attorney's and paralegal's fees. The court recognizes that plaintiff's counsel entered into a one-third contingent fee arrangement with plaintiff. Under that agreement, plaintiff's counsel would be entitled to $27,500.00. Despite the fact that the court's award of fees is greater than the amount owed to the attorney under the contingent fee arrangement, plaintiff's counsel is entitled to the full amount of the fees awarded by the court. *See Cooper v. Singer,* 719 F.2d 1496, 1507 (10th Cir.1983).

### III. *Defendants' Motion for Review of the Clerk's Taxation of Costs.*

 Review of the clerk's assessment of costs is a de novo review addressed to the sound discretion of the court. *Farmer v. Arabian American Oil Co.,* 379 U.S. 227, 232–33, 85 S.Ct. 411, 415, 13 L.Ed.2d 248 (1964). The court must allow the prevailing party to recover all costs authorized by 28 U.S.C. § 1920 unless some reason appears for penalizing the prevailing party. *True Temper Corp. v. CF & I Steel Corp.,* 601 F.2d 495, 509–100 (10th Cir.1979). Where expenses are not specifically authorized by section 1920, the court should sparingly exercise its discretion in allowing such costs. *Farmer,* 379 U.S. at 235, 85 S.Ct. at 416.

Defendants urge that all costs for postage, copies, depositions, long-distance telephone calls and computer-assisted research time should be denied.

### A. *Copies.*

Section 1920 provides for taxation of costs of copies only if they were "necessarily obtained for use in the case." Plaintiff's itemization of copy costs provides no information as to what items were copies or for what purposes they were used. Absent such information, the court may disallow these expenses. *American Key Corp. v. Cumberland Assoc.,* 102 F.R.D. 496, 499 (N.D.Ga.1984). The court in this instance

will reserve ruling on whether these copies are properly taxable and will allow plaintiff the opportunity to provide us with further information as to the nature of the documents copied and how they were necessary for trial.

**B. *Postage and Toll Calls.***

■ Neither postage nor toll calls are listed in section 1920 as items properly taxable as costs. Finding no statutory authority for these items, the court, in its discretion, will deny taxation of such items. *See Hollenbeck v. Falstaff Brewing Corp.*, 605 F.Supp. 421, 439 (E.D.Mo.1985); *Wolfe v. Wolfe*, 570 F.Supp. 826, 828 (D.S.C.1983). *See also* 6 J. Moore, *Moore's Federal Practice* ¶ 54.77[8] at 54–480 (1986).

**C. *Computer-Assisted Research Expenses.***

■ Similarly, section 1920 makes no express provision for taxing computerized legal research expenses. Some courts, recognizing that use of computerized legal research is totally reasonable, if not essential, in contemporary legal practice, have allowed costs for such expenses. *See, e.g., Wehr v. Burroughs Corp.*, 619 F.2d 276, 285 (3d Cir.1980). The majority of courts, however, have refused to tax such expenses because they are not specifically listed in section 1920. These courts reason that such expenses should be treated as attorney's costs absorbed by the attorney's overhead and fees rather than as ordinary costs. *See, e.g., Leftwich v. Harris-Stowe State College*, 702 F.2d 686, 695 (8th Cir. 1983); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 309 n. 75 (2d Cir. 1979); *Litton Systems, Inc. v. AT & T*, 613 F.Supp. 824, 836 (S.D.N.Y.1985); *Roberts v. Charter National Life Insurance Co.*, 112 F.R.D. 411, 413 (S.D.Fla.1986). *See also* Moore, *supra*, at ¶ 54.77[8] at 54–480, 481. We believe the majority rule to be the most reasonable approach and will deny taxation of costs for computer-assisted research expenses.

**D. *Depositions.***

■ The court has great discretion to tax deposition costs if it finds the deposi-

tion was "necessarily obtained for use in the case." *Miller v. City of Mission*, 516 F.Supp. 1333, 1340 (D.Kan.1981). All but one of the deposition witnesses testified at trial. The court finds that the depositions for which plaintiff seeks costs were not purely investigatory in nature and were necessary for proper examination at trial. The court therefore finds the deposition costs properly taxable.

■ The court also finds that *copies* of these depositions are also properly taxable because the copies were reasonably necessary to litigation of the case. *See Ramos v. Lamm*, 713 F.2d 546, 560 (10th Cir.1983). The costs of these copies will be allowed pursuant to 28 U.S.C. § 1920(4) as fees for exemplification and copies of papers. *See Ramos*, 713 F.2d at 560.

IT IS THEREFORE ORDERED that defendants' motions for judgment notwithstanding the verdict, for new trial and/or remittitur are denied.

IT IS FURTHER ORDERED that plaintiff's motion for attorney's fees is granted. Plaintiff's attorneys are awarded a total of $29,426.40 in fees.

IT IS FURTHER ORDERED that the clerk's assessment of costs is affirmed with the exception of the following: $842.10 for copies; $421.37 for postage; $54.30 for long-distance calls; and $97.76 for Westlaw research time. Plaintiff shall have twenty (20) days from the date of this order to provide the requested information as to copy expenses. Defendants shall have ten (10) days thereafter to make their objections. The court will at that time rule on whether the copy expenses as taxed by the clerk are proper.